PEOPLE *v.* BELCHER

1. CRIMINAL LAW—PRELIMINARY EXAMINATION—EXISTENCE OF CRIME
   —PROBABLE CAUSE—APPEAL AND ERROR.
   > The existence of probable cause to believe that a crime has been
   > committed and the existence of probable cause to believe that
   > the defendant committed the crime are to be determined
   > primarily by the examining magistrate; an appellate court
   > has no right to substitute its judgment for the examining
   > magistrate's unless there has been a clear abuse of discretion.

2. HOMICIDE—ARSON—CORPUS DELICTI—EVIDENCE.
   > The prosecution may establish the *corpus delicti* of a murder
   > committed in the perpetration of an arson by showing that
   > a building was burned, that the fire was intentionally or wil-
   > fully set, and that a person died as a result of the fire.

3. HOMICIDE—ARSON—PRELIMINARY EXAMINATION—PROBABLE CAUSE.
   > Examining magistrate's finding that there was probable cause to
   > believe that the defendant had committed murder in the per-
   > petration of an arson was not a clear abuse of discretion
   > where there was evidence that the defendant was the only
   > person on the main floor of the burned house when the first
   > witness arrived and that the defendant had been dating a
   > woman who, ten days before the fire, had threatened to stop
   > seeing the defendant unless he told his wife, killed in the fire,
   > that he was going to divorce her.

4. EVIDENCE—CIRCUMSTANTIAL EVIDENCE—USE.
   > The legitimate use of circumstantial evidence entails proof of a
   > series of facts, which when viewed together form a chain of
   > evidence showing a certain result.

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 21 Am Jur 2d, Criminal Law §§ 443, 444, 447, 449, 450.
[2] 30 Am Jur 2d, Evidence §§ 1140–1142, 1173.
[4–7] 30 Am Jur 2d, Evidence §§ 264–266, 1091.
[7, 8] 30 Am Jur 2d, Evidence §§ 1163, 1168, 1170–1172.
[8] 5 Am Jur 2d, Appeal and Error §§ 702–896.

5. EVIDENCE—CIRCUMSTANTIAL EVIDENCE—WEIGHT.
   Circumstantial evidence that satisfies the mind is equal to positive evidence; it produces the same effect.

6. EVIDENCE—CIRCUMSTANTIAL EVIDENCE—SUFFICIENCY.
   Circumstantial evidence may justify a jury verdict.

7. CRIMINAL LAW—EVIDENCE—CIRCUMSTANTIAL EVIDENCE—SUFFICIENCY—APPEAL AND ERROR—STANDARD OF REVIEW.
   A reviewing court must determine whether the total evidence, including reasonable inferences, when put together is sufficient to warrant a jury's conclusion that the defendant is guilty beyond a reasonable doubt.

8. CRIMINAL LAW—APPEAL AND ERROR—SCOPE OF REVIEW.
   An appellate court reviews only the legal sufficiency of the evidence and determines whether credible evidence exists on the record, which if believed, would justify reasonable men to conclude that all the elements of the crime charged were established beyond a reasonable doubt.

Appeal from Oakland, Philip Pratt, J. Submitted Division 2 March 4, 1970, at Lansing. (Docket No. 5539.) Decided January 18, 1971. Leave to appeal denied March 23, 1971. 384 Mich 821.

Harry Belcher was convicted of first-degree murder in the perpetration of arson. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Thomas G. Plunkett,* Prosecuting Attorney, *Dennis Donohue,* Chief Appellate Counsel, and *Bruce T. Leitman,* Special Assistant Prosecuting Attorney, for the people.

*Jerome K. Barry,* for defendant.

Before: J. H. GILLIS, P. J., and DANHOF and O'HARA,* JJ.

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

J. H. Gillis, P. J.   Defendant, Harry Belcher, was charged with and convicted, following trial by jury, of committing murder in the perpetration of arson in contravention of MCLA § 750.316 (Stat Ann 1954 Rev § 28.548).   Defendant was sentenced to life imprisonment and brings this appeal upon leave granted.[1]

In the early morning of January 25, 1965, a fire struck the home of defendant, his wife, and six children.   Defendant escaped the blaze suffering only from smoke inhalation.   The remainder of the family died due to asphyxiation brought about by the smoke.   Following investigation by the Ferndale police and fire departments, defendant was arrested and charged.

Defendant's first issue on appeal challenges the finding by the magistrate at the preliminary examination that a crime was committed and that probable cause existed to believe defendant committed the crime.   The rule is well settled that the existence of probable cause is primarily for the determination of the examining magistrate.   This Court is not at liberty to substitute its judgment for that of the magistrate unless there has been a clear abuse of discretion.   *People* v. *Karcher* (1948), 322 Mich 158; *People* v. *O'Leary* (1967), 6 Mich App 115.

Where, as here, defendant is charged with murder committed in the perpetration of an arson, the prosecution may establish the *corpus delicti* of the crime by showing that a building was burned, that the fire was intentionally or wilfully set, *Peterson* v. *Oceana Circuit Judge* (1928), 243 Mich 215; *People* v. *Porter* (1934), 269 Mich 284, and that a person died as a result of the fire.   See generally 3 Gillespie, Michigan Criminal Law and Procedure (2d ed), § 1700,

---

[1] Leave was granted by order of this Court dated February 14, 1969.

p 2057, as to the establishment of the *corpus delicti* by circumstantial evidence. Testimony was adduced at the preliminary examination, which, if believed, established that Catherine Joyce Belcher, defendant's wife, died due to asphyxiation during a fire in the Belcher home. There was also evidence tending to show that the fire originated on the landing of a stairway leading to the basement, that a fast-burning accelerant was used in starting the fire, that the accelerant was gasoline, and that the fire did not start accidentally, but rather was incendiary in nature.

Regarding the question of probable cause to believe defendant started the fire the evidence centered on two points. First, defendant was the only person on the main floor of the house when the first witnesses arrived. Second, he had, for approximately one year, been dating another woman who, ten days before the fire, had threatened to stop seeing the defendant unless he told his wife that he was going to divorce her. In light of the evidence establishing that a crime was committed together with defendant's presence at the scene of the crime and possible motive[2] for disposing of his wife, we are unable to conclude that the magistrate's finding of probable cause was a clear abuse of discretion.

Defendant's second claim on appeal is that the lower court erroneously allowed the prosecution to build inference upon inference in its proofs. In support of this claim defendant cites *People* v. *Petro* (1955), 342 Mich 299.

It must be remembered, however, that an important distinction exists between the pyramiding of inferences condemned in *Petro, supra,* and the legitimate use of circumstantial evidence. The for-

---

[2] See generally *People* v. *Kuhn* (1925), 232 Mich 310, regarding the effect of proof of motive.

mer amounts to little more than prohibiting inferences based upon evidence which is itself speculative or uncertain. *People* v. *Helcher* (1968), 14 Mich App 386. The latter, however, involves proof of a series of *facts,* which when viewed together form a chain of evidence showing a certain result. As noted in *People* v. *Vanderpool* (1870), 1 Mich NP 264, 269:

"If circumstantial evidence satisfies the mind, then it is equal to positive evidence, because it produces the same effect."

Thus, although "each link in the chain of circumstantial evidence must be established beyond a reasonable doubt" [*People* v. *Gerndt* (1928), 244 Mich 622, 637], such evidence may justify a jury verdict. Furthermore, as a practical matter, "the crime of arson is so peculiarly one of secrecy" that as is often the case in such instances, "the people [might] necessarily [be] confined to circumstantial evidence". *People* v. *Porter* (1934), 269 Mich 284, 292.

We believe that the following statement by the United States Court of Appeals for the First Circuit adequately articulates the point:

"The defendant cautions us against 'piling inference upon inference.' As interpreted by the defendant this means that a conviction could rarely be justified by circumstantial evidence. The rule is not that an inference, no matter how reasonable, is to be rejected if it, in turn, depends upon another reasonable inference; rather the question is merely whether the total evidence, including reasonable inferences, when put together is sufficient to warrant a jury to conclude that defendant is guilty beyond a reasonable doubt. If enough pieces of a jigsaw puzzle fit together, the subject may be identified even though some pieces are lacking. Reviewing the evi-

dence in this case as a whole, we think the jury was warranted in finding beyond a reasonable doubt the picture of defendant Dirring." *Dirring* v. *United States* (CA1, 1964), 328 F2d 512, 515, *cert den* (1964), 377 US 1003 (84 S Ct 1939, 12 L Ed 2d 1052), *reh den* (1964), 379 US 874 (85 S Ct 27, 13 L Ed 2d 83). (Citations omitted.)

See also, *People* v. *Helcher, supra.*

Without going into detailed analysis of each of the points defendant alleges to be an inference based upon an inference, suffice it to say that we believe inferences necessary to the prosecution's case were permissible and not based upon speculation or conjecture. As the detailed recitation of facts set forth below illustrate, enough pieces of the jigsaw puzzle did fit together so that "the subject may be identified even though some pieces are lacking".

Turning to defendant's third issue on appeal, it is alleged that insufficient evidence was adduced at trial to support the jury verdict. We have reviewed the transcript of the trial with great care. The record discloses evidence, which, if believed, support the following:

Just before 6 a.m. on January 25, 1965, Dennis Lukasik was awakened from his sleep by a voice crying "Help, fire". After hearing the voice a second time, he got up, ran out to the front porch of his home and shouted "Where are you?" He then heard the response: "This is Belcher, 446 Hazelhurst". Lukasik went back inside, called the fire department, dressed, and ran toward the Belcher residence.

After arriving, by way of an alley and through Belcher's back yard, Lukasik attempted to enter the home through the back door, but was driven off by smoke and flames. As he went around the house toward the front he saw defendant in one of the main floor windows. The glass was broken out and de-

fendant's face was flush against the screen. Lukasik pulled the screen out of the window, got a ladder lying a few feet away and put it in position so defendant could climb out.

In a few moments the fire department arrived and took charge. Upon the department's arrival, defendant immediately pointed toward the upstairs of the house and said, "My wife and kids are up there". A fire ladder was put in place and one of the firemen ascended to the second floor, carrying special breathing equipment with him. During a search of the upstairs the fireman located the bodies of the seven victims.

Both Lukasik and defendant were hospitalized— the latter for several days. Neither, however, suffered serious or permanent injury.

The combined investigation of the Ferndale police and fire departments and Michigan State Police uncovered several significant findings. The fire originated on a small landing at the head of the basement stairs. From the landing the fire burned up and through the staircase leading to the second floor.

On a ledge in the landing area, the remains of a small plastic wastebasket which contained some garbage were found. The garbage was saturated with what was chemically proven to be gasoline. No other container showing traces of gasoline was found in the immedate vicinity of the fire. However, a gas can was located in defendant's workshop in the basement.

Beyond the existence of gasoline in the wastebasket, expert witnesses also pointed to the depth of the char marks on the landing floor and char marks on the door jamb leading from the kitchen to the landing to show the existence of a fast-burning accelerant. The deep char marks indicated that the fire burned downward into the flooring far more than

usual, thereby contradicting the tendency of fires to burn in an upward direction. The second point demonstrated that the kitchen door was open during the fire. As one expert testified:

"*Q*. Now, this landing, 2 by 2 landing that you referred to, you described the fire as going in a cone-shaped form?

"*A*. No, in that it raised from there, but this landing was affected by a door to the kitchen, which would have been the normal pattern. The fire in this instance was so intense in this landing area that it acted something like a blowtorch and burnt up through the upper stairway and went up to the upper floor. The burning was very intensive in the landing.

\*        \*        \*

"*The Court:* And one thing further, do I understand that had there been any accelerant, the usual pattern of the fire would have been up the stairs and through the lower floor?

"*The Witness:* The heat would have followed the line of least resistance, and the least resistance would have been through the open door, and the natural pattern of the heat of the fire will follow in that manner, unless you have something to drive the heat in a certain direction, it will follow the draft."

It was also the expert's opinion that between one and two quarts of gasoline would have been necessary to produce the type of fire that occurred in the Belcher home.

Expert testimony was also elicited to the effect that the gas appliances and heating units in the home could not have started the fire. This conclusion was reached from the pattern of the char marks and the distance of the gas burners from the marks. If the burners had caused a spark, starting the fire, it would also have caused an explosion; yet there was

no evidence in the Belcher house indicating that such an explosion had occurred.

The evidence also shows that the house was equipped with three telephones: one each in the basement, on the main floor and the second floor. It was proven, however, that the telephone wiring in the basement had been altered in such a way that the phones would not work. Since telephone calls were received in the Belcher home during the afternoon before the fire, the tampering with the wires would have had to have occurred within approximately 12 hours of the fire.

The testimony of the fireman who located the bodies of the victims established that they were all found in the east upstairs bedroom. This was despite the fact that defendant himself testified that his wife slept with him in a bedroom on the main floor and that his children slept two each in the three bedrooms on the second floor.

It was also established that the bunkbed in the east bedroom was flush against the closed door, when the fireman arrived. (The fireman testified that he experienced some difficulty in opening the door, which opened inward, due to the bed blocking the doorway.) Further evidence established that the blocked door was the only doorway to the bedroom.

In the living room a pair of men's slacks were found lying on the sofa. On the floor, near the sofa, were a pair of heavy men's socks, described as yellow-grey in color. Expert testimony was introduced to establish that traces of gasoline were found on the socks.

The final witness was the defendant's paramour. Upon request of the prosecutor the witness was declared hostile and was questioned as such. From her testimony, the jury could have reasonably believed the following: defendant had made several promises

to her to ask his wife for a divorce, but never did so. The girl and defendant met on January 15, when she threatened to terminate their relationship unless he kept his promise to ask his wife for a divorce.

The last time they saw each other was during the evening of January 23, less than 36 hours before the fire. At this time the girl reminded defendant that he would be with his wife all the next day and that he should talk to her then about the divorce. He replied that he "would try again to bring it up to her".

Defendant and the girl had also discussed the financial problems involved in divorce due to alimony and child support. They apparently concluded that defendant would not be able to meet this financial responsibility on his own, and that the girl, therefore, would have to continue to work should a divorce take place and they get married.

Defendant testified in his own defense. He stated that he was first awakened by the smoke and by his difficulty in breathing. He got out of bed and stumbled over a shoe on the floor. He picked up the shoe and threw it at the window, to break it and let some air in the room. When he tried to open the bedroom door, he panicked and pushed, rather than pulled and was, thus, unable to open the door, which opened inward. Defendant stated that he then went to the broken window to get some fresh air. At this point he saw Lukasik.

Defendant denied starting the fire. He also denied knowledge of the unwiring of the telephone, disclaimed ownership or use of the socks containing gasoline traces, and could give no reason why his wife was upstairs or why she and the six children were barricaded in the bedroom. Furthermore, he denied making any calls for help and specifically

denied making the cries which Lukasik testified he heard.

Defendant's denial of the ownership of the socks was based largely on his alleged allergic reaction to wool. It was established by expert testimony, however, that the socks were not made of wool.

Defendant admitted in his testimony that the ladder, which he directed Lukasik to get for his escape from the house, had been placed there by himself only a few days preceding the fire. Inherent in defendant's testimony was the position that the location of the ladder was merely coincidental.

The probability of defendant's alleged difficulty with getting the bedroom door open after being awakened was brought into question by prosecution evidence. Testimony was elicited to the effect that the bedroom door was quite loose and that it tended to open by itself, if left alone.[3]

---

[3] One prosecution witness stated:

"*Q.* What was the distance from around between the edge of the door and the door jamb around it, if you know?

"*A.* You mean the opening?

"*Q.* Yes, if there was one.

"*A.* There was an opening of perhaps a 16th of an inch. I wouldn't

\* \* \*

"*Q.* Was there any binding anywhere?

"*A.* Absolutely none. It was very loose.

"*Q.* Very loose?

"*A.* Yes.

"*Q.* Now—

"*A.* As a matter of fact, sir, if I may elaborate on that point; that when I first closed the door and attempted to close it, it wouldn't close. There was play in it where it kept opening of its own, without any pulling.

"*Q.* All right. Did you eventually get the door closed?

"*A.* I don't think I did, no, sir.

"*Q.* Were you at any time present when anyone else did?

"*A.* Yes, sir. I was present when you did.

"*Q.* Did you see it closed at that time?

"*A.* I did not.

"*Q.* If the door that opened to the inside of the bedroom were just left, or if the knob were tilted, did you make any observations as to what the door would do under those circumstances?

"*A.* Yes, it would pop back open.

It is, of course, settled law that this Court reviews only the legal sufficiency of the evidence. Whether we as individuals agree or disagree with the verdict is irrelevant. It is our function to merely determine whether credible evidence exists on the record, which if believed, would justify reasonable men to conclude that all the elements of the crime were established beyond a reasonable doubt. *People* v. *Stevens* (1965), 1 Mich App 673; *People* v. *Doris White* (1965), 2 Mich App 104; *People* v. *Panknin* (1966), 4 Mich App 19. Our review of the record satisfies us that such sufficient evidence does exist.

From the existence of gasoline in the plastic container, the pattern of the char marks caused by the fire and distance of any utility which may have caused an accidental spark, the jury was more than justified in believing that the fire was not an accident. Moreover, the men's socks with gasoline traces, defendant's possible motive in seeking an alternative to an expensive divorce, his being the only other person on the premises at the time Lukasik arrived, the location of all the victims in one room with the door barricaded from the inside, the disconnected telephone wires, and defendant's difficulty in opening the bedroom door which, according to the testimony, had a propensity to open and stay open by itself, could have led reasonable minds to conclude that the fire could have been set by only one individual.

Significantly, the above points are all *facts*. They are not inferences. They are not speculative, uncertain or the result of conjecture or possibility. Al-

---

"*Q.* Just pop back in?

"*A.* Yes, and I believe that at the times that I checked it, which were several times, it would have remained open perhaps four to six inches; it wouldn't go back all the way and it wouldn't go any closer to the jamb or the locking mechanism other than four to six inches perhaps."

though the evidence was circumstantial, it was sufficient to warrant the result.

Defendant's final allegation on appeal relates to the admissibility of certain opinion evidence by one of the prosecution's witnesses. While defendant argues that the admission of the testimony into evidence was error and that the error was prejudicial, we do not reach the merits of the question.

The expert witness testified that a petroleum accelerant was used to start the fire, that the fire was incendiary in nature, and that it was started by "human hands". No objection was raised below.

Defendant argues that no objection was necessary to preserve the question for appeal. We disagree.

This Court has repeatedly held that in the absence of manifest injustice we will not review evidentiary questions not raised in the trial court. *People v. William L. Thomas* (1965), 1 Mich App 118; *People v. Will* (1966), 3 Mich App 330; *People v. Lewis* (1967), 6 Mich App 447; *People v. Gill* (1968), 12 Mich App 383; *People v. Maglaya* (1969), 17 Mich App 379. See also: *People v. Dorrikas* (1958), 354 Mich 303.

Defendant's reliance on the authority he cites is misplaced. In every case cited a fundamental injustice was involved, usually concerning a basic constitutional right which was violated at trial without objection by trial counsel.[4] Even assuming, without deciding, that the expert's opinion was erroneously admitted and that it was prejudicial, we do not believe that it resulted in such a manifest injustice as

---

[4] Defendant cites *People v. Limon* (1966), 4 Mich App 440 (admission of a confession without objection by trial counsel); *People v. Timmons* (1942), 300 Mich 653 (violation of hearsay rule and right to confrontation without objection by trial counsel); *People v. Hall* (1891), 86 Mich 132 (admission by trial counsel that defendant committed the offense charged followed by a plea of not guilty was the basis of the jury instruction by trial court that defendant was guilty).

to require attention by this Court without being first preserved by timely objection.

Affirmed.

All concurred.